IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PATRICIA L. CARROLL, individually and as
personal representative of THE ESTATE OF
RONALD KENNETH CARROLL, deceased

                          Plaintiff,                         OPINION AND ORDER

          v.                                                  15-cv-373-wmc

ABB, INC., ATWOOD & MORRILL CO.,
INC., A.W. CHESTERTON COMPANY,
CRANE CO., CROSBY VALVE, INC.,
FLOWSERVE US INC., INGERSOLL RAND
COMPANY and JOHN CRANE INC.,

                          Defendants.

---

Having been diagnosed with mesothelioma just three months earlier, Ronald

Carroll died on July 23, 2015. Unquestionably, Carroll's long-term exposure to asbestos

while working in the Navy and later at Wisconsin Power & Light contributed to his

contracting mesothelioma, a debilitating, ultimately fatal, lung disease uniquely caused

by asbestos. In this civil suit, however, plaintiff Patricia Carroll, Ronald Carroll's wife

and the personal representative of his estate, bring claims against other defendants,

manufacturers of asbestos products or of industrial equipment in which asbestos was

used, alleging that their products were also causes of Ronald Carroll's death.

Before the court are defendants' motions for summary judgment, arguing

primarily that plaintiff cannot prove that any of defendants' products caused Ronald

Carroll's injury and that defendants cannot be held liable for risks of harm introduced by

third party manufacturers of asbestos products under the so-called "bare metal" defense.

(Dkt. ##228, 252, 253, 261, 271, 278, 291, 303.)  For the reasons explained below, the court will grant summary judgment to all defendants except John Crane Inc., the single manufacturer for which plaintiff has presented enough evidence for a reasonable jury to infer that its products were a cause of Carroll's asbestos-related injury,

UNDISPUTED FACTS[1]

**A.  Ronald Carroll's Exposure to Asbestos at Wisconsin Power & Light**

While plaintiff acknowledges that Ronald Carroll was exposed to "respirable" asbestos while working as a "boiler tender helper" and "boiler tender" for the U.S. Navy between 1956 and 1959, the claims against defendants in this case arise from the time Carroll spent working at Wisconsin Power & Light ("WP&L") between 1959 and 1974.[2] After joining WP&L in 1959 as a "plant helper" at its Rock River generating station, located just outside Beloit, Wisconsin, in 1963, Carroll became an "auxiliary equipment operator" at WP&L's Blackhawk generating station in Beloit.  Carroll then worked as a "boiler operator" between 1966 and 1973 or 1974, at which time he became a "meter reader."  As a meter reader, Carroll no longer worked inside of the plants.

---

[1] Viewed in the light most favorable to plaintiffs as the nonmoving party, the court finds the following facts undisputed unless otherwise noted.  Because the parties are completely diverse and the amount in controversy exceeds $75,000, this court has subject matter jurisdiction.  28 U.S.C. § 1332.

[2] "Respirable" asbestos refers to particles "capable of being taken in by breathing."  www.merriam-webster.com/dictionary.com  (last viewed April 11, 2017).  To the court's knowledge, there is no dispute that defendants here all used respirable asbestos in manufacturing at least some of their products.

Both the Rock River and Blackhawk facilities had "enclosed units," and Carroll worked in that unit at each plant. As a boiler operator, Carroll was responsible for turning on the boilers in the morning and turning them off at night, as well as cleaning up, repairing leaky valves, conducting "overhauls" and performing maintenance work. In each of those capacities, Carroll was exposed to asbestos by working with insulation, packing, gaskets, valves, pumps, boilers, steam traps, air compressors, drum and feed lines, steam pipes and turbines. To make matters worse, Carroll performed all of those tasks without wearing a mask or any other form of respiratory protection.[3]

In addition to these exposures, each of the four boilers at each WP&L plant would be overhauled approximately once every four years, which would require: shutting down the boiler; installing and removing insulation; removing and installing gaskets on valves; "repacking valves"; overhauling air compressors; tearing down turbines; and reinsulating turbines with "asbestos mud." As a result, overhauls were a further contributor to Carroll's asbestos exposure. Additionally, repairing valves would require Carroll to remove and re-install gaskets and packing, which routinely included asbestos exposures, and he also replaced gaskets on steam traps, drums and feed lines, boilers, pumps, turbines and compressors, as well as removed packing from pumps, again resulting in asbestos exposures.

---

[3] Carroll was also exposed to asbestos in his earlier position at WP&L as an auxiliary equipment operator. Plaintiff's experts opine that Carroll's exposures to asbestos at WP&L were enough to cause his death from mesothelioma. While defendants' challenge plaintiff's proposed facts relying on those opinions, those disputes are for the trier of fact to resolve at trial.

### B. Carroll's WP&L Coworkers

Most of plaintiffs' facts are derived from deposition testimony from three of Carroll's coworkers, Gene Samuelson, Robert Rygh and Dale Herman. Between 1968 and 1973, Samuelson worked with Carroll as both an auxiliary equipment operator and a boiler operator. Both Rygh and Herman worked with Carroll as boiler operators between 1967 and 1973. Because work shifts rotated, boiler operators did not work with the same person for the same number of days each week, but Samuelson and Carroll worked together on the same shift most of the time. While a boiler operator's daily job duties changed depending on the shift worked, they also generally shared the same tasks.

During the graveyard shift, when the boilers were turned off for the night, these tasks included cleaning up, sweeping and repairing leaky valves, which, as already discussed, entailed removing and replacing the packing in them. Samuelson recalled that all of the valves that he worked on used asbestos regardless of their size. Herman had the same impression: the gaskets they removed and replaced contained asbestos because they were being used for high-heat applications. Herman saw Carroll repack valves at the Rock River plant, and they also worked together on repacking condensate pumps and boiler feed pumps at that plant. Consistent with Samuelson and Herman, Rygh also testified that Carroll and he used asbestos rope packing for valves that were necessary for high pressure steam.[4]

---

[4] Defendants generally challenge the *extent* to which these activities would have resulted in Carroll being exposed to asbestos, but, for the most part, do not challenge the accuracy of their descriptions of the *nature* of the boiler operators' activities.

According to Samuelson, replacing packing involved removing the old packing, cleaning the equipment and putting the new packing in. The old packing was typically in poor shape when removed, requiring the boiler operator to use tools to try to remove it without it breaking completely, and then to blow the rest of the packing out with an air hose or his or her own breath. To install new "rope packing" into a "valve stem," the individual would measure and cut the packing to the proper size, and then tap it into the valve with a hammer.

Repacking valves could take up a considerable amount of a boiler operator's time in a given week, particularly if an overhaul was taking place. Indeed, a single valve could take multiple hours to repack, and a single boiler unit could have at least 200 valves that needed their "bonnet gaskets" to be replaced. Additionally, Herman estimated that Carroll would likely repack a condensate pump once or twice a year as part of routine maintenance or in response to a leak. Replacing packing in various types of pumps, which also took place during overhauls and other routine maintenance, required a similar process. Similarly, boiler operators replaced rope-type gaskets that sealed the fire doors on the boilers with a cutting tool and a hammer. Overall, "repacking" work required boiler operators to be close to the valves and pumps, which could cause the packing material to get on their clothes, blow into in their faces and float in the air.

Based on his own experiences, Herman estimated that the gaskets Carroll would have replaced over the course of his career at WP&L numbers in the hundreds. Regardless of the type of gasket being removed and installed, Carroll's coworkers testified that dusty conditions inside both WP&L's Blackhawk and Rock River plants were

common. They also agreed that they never saw any warnings regarding working with asbestos before 1974, which was Carroll's last year as a boiler operator.

## C. Defendants

The remaining defendants in this case are: A.W. Chesterton; Crosby Valve LLC; Flowserve US, Inc.; Atwood & Morrill Co.; Ingersoll Rand Company; ABB, Inc.; John Crane Inc.; and Crane Co.[5] All defendants are manufacturers of industrial equipment in which asbestos replacement parts were used, manufacturers of asbestos replacement components, or both.

OPINION

Plaintiff's amended complaint contains claims against the remaining defendants for products liability, conspiracy, negligence per se and punitive damages. Plaintiff brings the products liability claims under both strict liability and negligence theories, but the parties generally ignore any substantive distinctions between those theories.

Each of the defendants moves for summary judgment on all claims. As an initial matter, plaintiff offers no facts or argument in support of its conspiracy and negligence per se claims, and so they will be dismissed. As to plaintiff's remaining products liability

---

[5] Defendant Atwood & Morrill asserts that it was "incorrectly sued as 'Weir Valves & Controls USA, Inc. f/k/a Atwood & Morrill" in its motion for summary judgment (dkt. #303); as their motion to dismiss will be granted, the court need not address this further. Additionally, defendants General Electric Company and Metropolitan Life Insurance Company have filed answers (dkt. ##38, 83), but nothing else regarding those defendants has been filed since by any party, nor has anything beyond an affidavit of service (dkt. #94) as to defendant FMC Corporation (which plaintiff "sued individually and as successor-in-interest to Crosby Valve, Inc.") been filed since by any party. Accordingly, the court will dismiss these three defendants.

claims, defendants' motions generally present similar arguments regarding plaintiff's causation evidence and the "bare metal defense," which the court addresses below. As for the request for punitive damages, that is resolved by looking at the merits of the underlying substantive claims.

## I.     Causation

Whether under a strict liability or negligence theory, to prevail on a products liability claim, a plaintiff must prove that the alleged defect caused injury.[6] *See Morden v. Continental AG*, 2000 WI 51, ¶ 45, 235 Wis.2d 325, 611 N.W.2d 659 (negligence); *Zielinski v. A.P. Green Indus., Inc.*, 2003 WI App 85, ¶ 8, 263 Wis.2d 294, 661 N.W.2d 491 (strict-products-liability). To determine whether a plaintiff has sufficient evidence to prove causation at summary judgment, the court must evaluate "whether the defendant's negligence was a substantial factor in contributing to the result." *Zielinski*, 2003 WI App 85 at ¶ 16 (citation omitted).

With respect to what evidence constitutes an adequate showing of causation, Wisconsin courts have further held that:

> If there is no credible evidence upon which the trier of fact can base a reasoned choice between two possible inferences, any finding of causation would be in the realm of speculation and conjecture. Speculation and conjecture apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made. A mere possibility of causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it

---

[6] For this reason, the parties generally do not analyze plaintiff's strict liability and negligence products liability claims separately.

> becomes the duty of the court to direct a verdict for the defendant.

*Id.* at ¶ 16 (alterations and internal quotation marks omitted) (quoting *Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 458-59, 460, 267 N.W.2d 652 (1978)).  Moreover, regarding asbestos-related litigation in particular, Wisconsin courts have declined to adopt bright-line causation tests, choosing instead to weigh whether a defendant's product was a substantial factor causing injury "based on the totality of the circumstances surrounding the work . . . and the products . . . generally used."  *Id.* at ¶ 18.

## II.  Bare Metal Defense

### A.  *Spychalla* and *Moss* Decisions

In seeking summary judgment as to plaintiffs' products liability claims, defendants' principal argument is that plaintiff cannot establish that defendants caused Carroll's injury as a matter of law under the "bare metal" defense.  Simply put, the bare metal defense provides that "a manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute."  *Spychalla v. Boeing Aerospace Operations Inc.*, No. 11-CV-497, 2015 WL 3504927, at *2 (E.D. Wis. June 3, 2015) (quoting *Conner v. Alfa Laval Inc.*, 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012)).  To survive summary judgment in the face of a bare metal defense, therefore, a plaintiff must at least present evidence that a defendant either: (1) manufactured and distributed asbestos products; or (2) specified

or required that asbestos replacement parts be used with its products. *See id.* at *3; *see also Moss v. Trane U.S., Inc.*, 13-cv-42-bbc, 2016 WL 916435, at *4.

As an initial matter, the Wisconsin Supreme Court has yet to acknowledge the bare metal defense, but the parties seem to accept is application by focusing less on the degree to which the traditional bare metal defense overlaps with Wisconsin case law in the asbestos context and more on whether this case more closely resembles *Moss*, in which the district court found that the bare metal defense applied and granted summary judgment to defendant, or *Spychalla*, in which the district court found that based on the factual record at summary judgment, the bare metal defense would not apply. Accordingly, the court begins with those cases as well.

In *Spychalla*, three defendants, all manufacturers of aircraft equipment, moved for summary judgment in the Eastern District of Wisconsin under the bare metal defense after a Multidistrict Litigation ("MDL") court remanded a case to determine whether Wisconsin law recognized the bare metal defense. The MDL court held that defendants could only be liable if it does *not*, in light of its finding that "there [was] no evidence that [Spychalla] was exposed to respirable asbestos dust from a component part original to the defendants' aircrafts or engines or that any replacement part to which he was exposed was manufactured or supplied by the defendants." 2015 WL 3504927, at *2.

On remand, the district court denied defendants' summary judgment motions without deciding whether the Wisconsin Supreme Court would recognize the bare metal defense, since it was unclear whether the defense would apply in any event for two reasons. First, the court reasoned that if the original, completed products were

unreasonably dangerous and defectively designed, then "it makes little sense to preclude liability as a matter of law simply by virtue of the fact that the decedent did not come into contact with the defective products until some of the components had been swapped out," particularly where worn components "were replaced with replacement parts presumably very similar to the original components." *Id.* at *3. Second, none of the defendants "submitted a bona fide proposed finding of fact showing that they *did not specify* that asbestos-containing replacement parts should be used in their products." *Id.* (emphasis in original). As to the latter point, the *Spychalla* district court agreed with plaintiff that a reasonable jury could find that such a specification rendered the products defective, at least without an accompanying warning about the dangers of asbestos and particularly in light of plaintiff's expert's assertions that: (1) plaintiff would have consulted the manufacturers' service manuals; and (2) those manuals would have specified the use of replacement parts containing asbestos. *See id.* at *4-5.

In contrast, the district court in *Moss* granted summary judgment to the defendant on the basis that it neither manufactured, *nor* specified the use of, the asbestos products that injured the plaintiff. Specifically, the defendant in that case manufactured and sold boilers that, for the most part, did not contain asbestos insulation or lining at the time of sale, and for those that did originally contain asbestos gaskets and packing, those components needed to be replaced within one to two years. *See* 2016 WL 916435, at *1. There was also no dispute in *Moss* that: (1) the person or entity responsible for purchasing and maintaining the boilers made all decisions regarding replacement of their components, including whether to use materials containing asbestos; (2) the defendant

did not "require, specify or recommend the use of asbestos-containing materials"; and (3) the boilers were not designed specifically to use materials containing asbestos. *Id.*

Based on these undisputed facts, the *Moss* court granted summary judgment to the defendant on plaintiff's strict liability claim. The court found that since the plaintiff did not challenge the MDL court's finding that the defendant did not make or supply the asbestos materials to which the plaintiff was exposed, no liability could lie. *Id.* at *3. The district court also granted summary judgment to the defendants on the plaintiff's negligence claim, finding that the defendant had no duty to warn against the harmfulness of asbestos replacement products because (1) any danger was "not attributable to the fact that they were used in connection with [the defendant's] boilers," and (2) "there [was] no evidence that [the defendant] participated (either actually or constructively through some form of specifications) in integrating . . . asbestos-containing materials into the boiler." *Id.* at *4. The district court reasoned further that even if the defendant could be found negligent for failing to warn because the use of asbestos insulation in the boilers was "foreseeable," then recognized public policy factors set forth in *Rockweit v. Senecal*, 197 Wis. 2d 409, 541 N.W.2d 742 (Wis. 1995), would still dictate a finding of no liability. Specifically, two factors would control: (1) "allowing recovery would place too unreasonable a burden upon the tortfeasor"; and (2) "allowing recovery would have no sensible or just stopping point." *See id.* at *6-7.

As an initial matter, plaintiff points out that Wisconsin law applies a concept of duty broader than most other jurisdictions. (Pl.'s Opp'n Br. (dkt. #342) at 22-23 (citing *Behrendt v. Gulf Underwriters Insurance Co.*, 2009 WI 71, ¶ 635, 318 Wis. 2d 622, 768

11

N.W.2d 568 (everyone owes "the duty of refraining from those acts that may unreasonably threaten the safety of others").) However, the fundamental principles of the bare metal defense articulated in both *Moss* and *Spychalla* are consistent with product liability law in Wisconsin, since both cases premise liability on a defendant's failure to warn about the risks associated with its own products, not those associated with third-party products, at least absent evidence that defendant was aware such products contained asbestos. *See* Wis. Stat. § 895.047 ("A product is defective because of inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings *by the manufacturer* and the omission of the instructions or warnings renders the product not reasonably safe.") (emphasis added); Wis JI-Civil 3242 ("*A manufacturer of a product* has a duty to exercise ordinary care to warn of dangers which he or she knows, or should know, are associated with the proper use of a product. This duty exists whether or not the product was properly designed.") (emphasis added).

Nevertheless, plaintiff argues that her claims against defendants here are unlike the plaintiff's claims in *Moss* for two reasons of her own. First, like the plaintiff in *Spychalla*, the plaintiff here claims that defendants' products *were* defectively designed to incorporate asbestos products. Second, defendants here *did* specify that asbestos replacement parts should be used. Accepting these two requirements as an appropriate litmus test, the court addresses defendants' motions for summary judgment, with defendants grouped roughly into three separate categories according to their characteristics and the evidence plaintiff offers in response.

## B. Defendants Crosby Valve LLC, Atwood & Morrill Co., Inc. and ABB, Inc.

Offering deposition testimony from Carroll's coworkers, plaintiff asserts that Carroll would have worked on valves manufactured by defendants Crosby Valve LLC and ABB, Inc., but "probably" did not remove original components.  (*See* Pl.'s Addt'l PFOF [Crosby Valve] (dkt. #347) ¶¶ 259-260; Def.'s Resp. to Pl.'s Addt'l PFOF [ABB] (dkt. #372) ¶¶ 250, 262.)  Similarly, plaintiff asserts that Carroll would have worked on "Weir" valves manufactured by defendant Atwood & Morrill Co., Inc., but proposes no findings of facts or evidence regarding whether Carroll would have replaced any original components on Weir valves.  (*See* Def.'s Resp. to Pl.'s Addt'l PFOF (dkt. #390) ¶ 251.) Plaintiff also proposes no evidence that any of those three defendants supplied replacement components containing asbestos, nor that Carroll worked with, or defendants specified the use of, asbestos replacement parts.[7]

On this record, there are *no* facts from which a reasonable jury could find defendants Crosby Valve LLC, Atwood & Morrill Co., Inc. or ABB, Inc., liable for manufacturing a defective product or failing to warn about the dangers of asbestos.[8] Indeed, plaintiff proffers no evidence that defendants supplied original asbestos

---

[7] In summary judgment briefing, plaintiff attempts to blame all three defendants for failing to respond adequately to discovery requests for "sales records, equipment manuals, and specifications that could confirm whether [they] supplied replacement gaskets and packing to Mr. Carroll's worksite," but she never filed a motion to compel in response to defendants' allegedly inadequate discovery responses.  Rather than speculate as to what additional discovery may or may not have shown, the court resolves the defendants' summary judgment motions on the actual record before it.  (Pl.'s Addt'l PFOF [Crosby Valve] (dkt. #347) ¶ 275; Def.'s Resp. to Pl.'s Addt'l PFOF [ABB] (dkt. #372) ¶ 277; Def.'s Resp. to Pl.'ss Addt'l PFOF [Atwood & Morrill] (dkt. #390) ¶ 266.)

[8] Since the court's ruling does not rely on the additional proposed findings of fact filed by ABB, Inc., plaintiff's motion to strike those facts (dkt. #403) is denied as moot.

components that caused Carroll injury (such as what actual equipment was installed at the WP&L facilities and when), nor that defendants specified asbestos replacement parts. Nor does plaintiff propose any facts -- such as that defendants' valves could only be used with asbestos components or that defendants should have known to design them differently -- from which a reasonable jury could find that the subject valves were defectively designed. *See* Wis. Stat. § 895.047 (under a strict liability defective design claim, requiring a plaintiff to prove that "the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe"); Wis JI-Civil 3240 ("It is the duty of the manufacturer to exercise ordinary care in the design, construction, and manufacture of its product so as to render the product safe for its intended use and also safe for unintended uses which are reasonably foreseeable."). Accordingly, defendants Crosby Valve LLC, Atwood & Morrill Co., Inc. and ABB, Inc. are entitled to judgment as a matter of law.

**C. Defendants Flowserve US Inc., Crane Co. and Ingersoll Rand Company**

As for these next three defendants, plaintiff asserts -- again with evidentiary support from deposition testimony of Carroll's coworkers -- that he would have worked on valves manufactured by defendants Flowserve US Inc. and Crane Co., or pumps manufactured by defendant Ingersoll Rand Company. (*See* Def.'s Resp. to Pl.'s Addt'l PFOF [Crane Co.] (dkt. #368) ¶¶ 253-254; Def.'s Resp. to Pl.'s Addt'l PFOF [Ingersoll Rand] (dkt. #384) ¶ 252; Def.'s Resp. to Pl.'s Addt'l PFOF [Flowserve] (dkt. #391) ¶ 252.) As to these three defendants, however, plaintiff further offers evidence that at least

*some* of the valves or pumps these defendants sold during the time period that Carroll worked at WP&L actually contained original asbestos gaskets and packing. (Def.'s Resp. to Pl.'s Addt'l PFOF [Crane Co.] (dkt. #368) ¶ 270; Def.'s Resp. to Pl.'s Addt'l PFOF [Ingersoll Rand] (dkt. #384) ¶ 259; Def.'s Resp. to Pl.'s Addt'l PFOF [Flowserve] (dkt. #391) ¶ 254.) Moreover, plaintiff offers evidence that at least some of these defendants' maintenance manuals specified asbestos packing to be used as replacement components. (Def.'s Resp. to Pl.'s Addt'l PFOF [Crane Co.] (dkt. #368) ¶ 281; Def.'s Resp. to Pl.'s Addt'l PFOF [Ingersoll Rand] (dkt. #384) ¶ 262; Def.'s Resp. to Pl.'s Addt'l PFOF [Flowserve] (dkt. #391) ¶ 270.) Finally, deposition testimony from those defendants' corporate representatives support a finding that defendants Crane Co. and Flowserve actually sold replacement asbestos gaskets and packing (Pl.'s Addt'l PFOF [Crane Co.] (dkt. #325) ¶ 279; Pl.'s Addt'l PFOF [Flowserve] (dkt. #360) ¶ 273.)

Unlike defendants Crane Co. and Flowserve, plaintiff offers *no* direct evidence that Ingersoll Rand sold replacement asbestos components. Instead, plaintiff would have the trier of fact infer that Ingersoll Rand distributed replacement asbestos parts to WP&L based on plaintiff's assertion that "[t]hroughout Mr. Herman's tenure at WP&L, the replacement casing gaskets for pumps came from the manufacturer of the pump on which the gasket was to be installed." (Pl.'s Addt'l PFOF (Ingersoll Rand) (dkt. #344) ¶ 258.) As support, plaintiff cites the following exchange from Herman's deposition:

> Q: Do you recall whether the casing gaskets that you would install came from the manufacturer of the pump on which you were going to install it?
>
> . . . .

15

A: Yes.

. . . .

Q: Would that have been consistent throughout your tenure as a boiler operator?

. . . .

A: Yes.

(Dep. of Dale Herman (dkt. #225) at 75:11-24.)[9]

As Ingersoll Rand points out, however, Herman also testified during that same deposition that he could not estimate what percentage of a particular brand of sheet gaskets WP&L actually used, because "various brands" were used "depend[ing] on whoever was selling the cheapest product at the time." (*Id.* at 247:21-248:5.) Similarly, Herman could not remember the brand of casing gaskets or packing for pumps WP&L used because it depended on what was available in the storeroom (*id.* at 294-297). Even so, Carroll's co-worker, Robert Rygh, agreed that it was "probably true" that WP&L would purchase the cheapest packing and gaskets available at the time. (Dep. of Robert Rygh (dkt. #224) at 47:19-25.) Samuelson "personally thought" the same, but did not know. (Dep. of Gene Samuelson (dkt. #226) at 207:2-12.)

---

[9] The court has removed those portions of the transcript that contain objections on the grounds of vagueness, foundation and form (multiple questions). Indeed, defendants generally challenge much of plaintiff's coworker deposition testimony on the basis that it is speculative and that the witnesses often gave answers in response to leading questions, but plaintiff would otherwise face a near-impossible task to prove her case if not allowed to prompt coworkers regarding their memories of names of specific manufacturers, and then try to establish causation based on the experience of similarly situated employees. Therefore, defendants' objections are insufficient to prevent the admissibility of the answers.

Given the lack of evidence specifically placing Ingersoll Rand's asbestos products at WP&L, Herman's uncorroborated, unclear and at times contradictory testimony in response to vague questions at his deposition is insufficient for a reasonable trier of fact to infer that its original products contributed to Carroll's asbestos exposure. Moreover, plaintiff's limited evidence that Ingersoll Rand supplied asbestos parts falls into the same category as its evidence as to Flowserve and Crane Co. A trier of fact could reasonably find that all three defendants sold replacement asbestos parts to customers generally, but not that they did so to WP&L in particular.[10]

Therefore, plaintiff's defect claims based on pumps and valves or replacement parts containing asbestos sold by Flowserve, Crane Co. and Ingersoll Rand to WP&L are again nullified by the bare metal defense. Furthermore, plaintiff cannot survive summary judgment on her defective warning claim based on evidence that those three defendants specified or recommended the use of asbestos replacement parts. As with plaintiffs' general evidence regarding those manufacturers' sale of asbestos replacement parts, plaintiff fails to advance evidence from which a reasonable jury could infer a causal link between those specifications and Carroll's injury.

In *Spychalla*, the district court found that "a jury could reasonably find Spychalla worked with asbestos products that were specified by defendants," given that there was no evidence conflicting with plaintiff's expert's opinions that "Spychalla would have

---

[10] Although plaintiff presented evidence that those three defendants offered asbestos replacement parts for sale, additional evidence is lacking that links their replacement asbestos components to the WP&L facilities at which Carroll worked (e.g., purchase lists or invoices). Without this or other evidence from which a jury could reasonably infer that those products were a substantial factor causing injury to Carroll, all three defendants are entitled to summary judgment.

consulted the [defendants'] manuals and . . . the manuals would have specified that replacement parts contain asbestos. 2015 WL 3504927, at *5. In contrast, there is no evidence in this record -- whether in the form of expert opinion, sworn statements from his coworkers or otherwise -- that Carroll or the individuals responsible for stocking replacement parts ever consulted manuals or specifications that called for use of asbestos-laden parts. Rather, as already discussed, Carroll's coworkers testified at their depositions that decisions regarding what type of replacement parts to use were made based on price or availability, not an individual manufacturer's recommendations.

Similarly, in support of her design defect claim, plaintiff offers insufficient evidence that Carroll was exposed to asbestos components in originally installed valves or pumps by those same manufacturers, nor that those manufacturers' valves or pumps at WP&L required replacement parts with asbestos to operate properly. *See Moss*, 2016 WL 916435, at *5 ("[E]ven if plaintiff were to allege that American Standard defectively designed its boilers, such a theory would fail because there is no evidence that the original asbestos-containing materials installed by American standard caused plaintiff's injuries."); *cf. O'Neil v. Crane Co.*, 266 P.3d 987, 996 n.6 (Cal. 2012) ("A stronger argument for liability might be made in the case of a product that *required* the use of a defective part in order to operate. In such a case, the finished product would inevitably incorporate a defect. One could argue that replacement of the original defective part with an identically defective one supplied by another manufacturer would not break the chain of causation.") (emphasis in original). For all of the above reasons, plaintiffs have failed to offer sufficient evidence that the products of Crane Co., Flowserve or Ingersoll

Rand were substantial factors contributing to Carroll's injury, and so those three defendants are also entitled to judgment as a matter of law.

### D. Defendants A.W. Chesterton Company and John Crane Inc.

As to the remaining two defendants, A.W. Chesterton Company and John Crane Inc., the undisputed facts show that they sold gaskets and packing containing asbestos during the time that Carroll worked at WP&L. (Pls.' Addt'l PFOF (A.W. Chesterton) (dkt. #338) ¶ 257; Def.'s Resp. to Pls.' Addt'l PFOF (John Crane) (dkt. #373) ¶¶ 259, 270.) Unlike the other defendants, plaintiff also offers at least some evidence that those manufacturers' asbestos products *were* used in the facilities at which Carroll worked.

For starters, Herman testified that he worked with A.W. Chesterton gaskets, and "probably" did so at both the Blackhawk and Rock River WP&L facilities. (Pls.' Addt'l PFOF (dkt. #338) ¶¶ 250-51.) From this limited evidence, plaintiff argues that a reasonable jury might infer Carroll probably worked with A.W. Chesterton asbestos gaskets as well given Herman's testimony that Carroll generally worked with the same components he did. (*Id.* at ¶ 252 (citing Dep. of Dale Herman (dkt. #225) at 281:5-8 ("If I worked with [Edward valves], he worked with them.")).) Admittedly, this is meager proof in light of the fact that two of Carroll's other coworkers could not place A.W. Chesterton's products at WP&L -- (1) Rygh testified that A.W. Chesterton's name was familiar, but he could not remember working with its products (Dep. of Robert Rygh (dkt. #224) at 96:21-97:6), and (2) Samuelson could not even remember the name (Dep. of Gene Samuelson (dkt. #226) at 40:4-5).

In contrast, all three of Carroll's coworker recalled using packing and gaskets manufactured by John Crane Inc. (*See* Dep. of Gene Samuelson (dkt, #226) at 94:11-13.) Rygh even remembered working with Crane *asbestos* gaskets and packing, and further suggested that Crane and Garlock were the two brands that they used "an awful lot."[11] (Dep. of Robert Rygh (dkt. #224) at 30:22-32:6.) Samuelson also remembered Crane packing being used, albeit no further details about its size or packaging, nor whether he saw Carroll using it. (Dep. of Gene Samuelson (dkt. #226) at 105:24-106:21.) Finally, Herman remembered using Crane packaging, and he agreed that Carroll would have used it as well. (Dep. of Dale Herman (dkt. #225) at 64:16-65:12.) While Herman could give no further detail about Carroll using Crane packing, as alluded to already, he testified that boiler operators like Carroll and he would "just grab[] the right packing for the job," without paying much attention to its manufacturer. (*Id.* at 237:7-14.)

Lacking any direct evidence, such as purchase lists or invoices, whether plaintiff can survive summary judgment again depends on whether the coworkers' deposition testimony is enough for a reasonable jury to find more than a "mere possibility" that Carroll was injured by A.W. Chesterton's or John Crane's asbestos products. *Zielinski*, 2003 WI App 85 at ¶ 16. As already discussed, Wisconsin courts have declined to adopt

---

[11] The parties do not adequately explain apparent discrepancies between "Crane" asbestos products manufactured by John Crane Inc. and asbestos products manufactured by Crane Co. The most plausible explanation, however, appears to be that the predecessor of the John Crane Inc. was known as "The Crane Packing Company" (*See* Dep. of Gene Samuelson (dkt, #226) at 94:11-13), and that asbestos products manufactured by Crane Co. were labeled "Cranite." (Def.'s Resp. to Pl.'s Addt'l PFOF (Crane Co.) (dkt. #368) ¶ 281.) For purposes of summary judgment at least, the court will infer as much for plaintiff as the non-moving party.

a bright-line test for causation in the asbestos context; instead, opting to analyze in light of the totality of the circumstances, whether a plaintiff has presented enough evidence for a reasonable jury to find, without speculating, that a defendant's products were a substantial factor contributing to injury. *Id*. at ¶ 18.

With respect to this causation analysis, the parties primarily cite *Zielinski* and another Wisconsin Court of Appeals case, *Singer v. Pneumo Abex, LLC*, 339 Wis.2d 490, 809 N.W.2d 900 (Table), 2012 WL 130295 (Ct. App. 2012). In *Zielinski*, the Wisconsin Court of Appeals held that the plaintiffs presented enough evidence to create a genuine dispute of fact as to whether the decedent was exposed to the defendant's asbestos products. In that case, the defendant was listed on an approved vendor list; one of the decedent's coworkers testified at his deposition that the vendor list contained all of the materials approved for use; another coworker testified that they "probably bought" the defendant's products; and another testified that the decedent had the same asbestos-related job duties. *Id.* at ¶¶ 11-12, 19-20. Similarly, the same court held in *Horak v. Building Services Industrial Sales Co.*, 2008 WI App 56, 309 Wis. 2d 188, 750 N.W.2d 512, that the plaintiff had presented enough evidence for a reasonable jury to infer causation, since there was no dispute that the defendant sold asbestos products to the decedent's employer during the time he worked there, and he was one of only a few employees during that time. *Id.* at ¶ 10.

In *Singer*, the Wisconsin Court of Appeals expressly distinguished *Zielinski's* holding on the basis that the plaintiff presented no evidence that the defendant's asbestos-containing products were ever at the plant where the decedent worked. In

particular, *no* witness testified that the defendant's products were ever brought to that plant from another plant where they were delivered.  The Wisconsin Court of Appeals also held in *Alexander v. Auer Steel & Heating Co.*, 2015 WI App 28, 361 Wis. 2d 284, 862 N.W.3d 618, that a decedent's coworker's testimony that he "guessed" his employer got asbestos paper from either or both of "two suppliers that did most of [their] stuff," along with the two suppliers' admissions that they sold products to his employer and also sold asbestos paper in the past, was "hardly sufficient evidence to move an inference of causation outside the realm of speculation or conjecture, particularly because it [was] undisputed that both [suppliers] [sold] thousands of different products, the vast majority of which do not contain asbestos." *Id.* at ¶¶ 15-16.

Applying the guidance of these Wisconsin asbestos liability cases, the court finds that defendant John Crane Inc. is not entitled to judgment as a matter of law on the record before this court on summary judgment.  Indeed, there is more than enough evidence for a reasonable jury to find liability in light of evidence that:  Carroll was routinely exposed to asbestos from packing and gaskets in boilers and pumps used for high-heat applications; three of Carroll's coworker witnesses recalled using components manufactured by John Crane; and coworker Rygh suggested that WP&L boiler operators used "an awful lot of" them.

On the other hand, only one of Carroll's coworkers remembered "probably" working with A.W. Chesterton's products at the two facilities at which Carroll worked. There are *no* other facts in the record establishing whether or how many A.W. Chesterton asbestos products were used at WP&L.  Moreover, plaintiff herself asserts that the "two

primary brands of asbestos packing" to which Carroll was exposed were John Crane and Garlock, and the latter is not a defendant in this lawsuit. (Pl.'s Resp. to Def.'s PFOF [Crane Co.] (dkt. #324) ¶ 60.) Moreover, unlike *Zielinski*, in which the plaintiff also offered the decedent's coworker's testimony that the defendant's products "probably" at the employer's facility, that speculation was backed by evidence that the defendant was on an approved vendor list. On the meager evidence presented here, a reasonable jury could only speculate about the "possibility" that A.W. Chesterton's products were a substantial factor contributing to Carroll's injury.

Finally, the court will deny the remaining defendant's motion for summary judgment as to plaintiff's punitive damages claim. Although the evidence plaintiff presents at summary judgment that could support a punitive damages award is *far* from overwhelming, given the admission that John Crane Inc. knew asbestos could cause disease in 1970, but began testing its asbestos gaskets and packing only in 1980 (Def.'s Resp. to Pl.'s Addt'l PFOF (dkt. #373) ¶¶ 290-91), the court will not dismiss plaintiff's punitive damages claim at this juncture.

## ORDER

IT IS ORDERED that:

1) Defendants ABB, Inc., Atwood & Morrill Co., Inc., A.W. Chesterton Company, Crane Co., Crosby Valve, Inc., Flowserve US Inc., and Ingersoll Rand Company's motions for summary judgment (dkt. ##228, 252, 261, 271, 278, 291, 303, 309) are GRANTED.

2) Defendant John Crane Inc.'s motion for summary judgment (dkt. #253) is DENIED.

3) Plaintiff Patricia Carroll's motion to strike (dkt. #403) is DENIED AS MOOT.

4) Defendants General Electric Company, Metropolitan Life Insurance Company, and FMC Corporation are DISMISSED.

Entered this 12th day of April, 2017.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge